# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

BRETT JOHNSON,              )
                              )
          Petitioner,       )
                              )
     vs.                     )     Case No.  11-0188-CV-W-HFS-P
                              )
LARRY DENNEY,           )
                              )
          Respondent.    )

### OPINION AND ORDER DENYING PETITION FOR HABEAS CORPUS, AND DENYING THE ISSUANCE OF A CERTIFICATE OF APPEALABILITY

Petitioner, Brett Johnson, filed this pro se habeas corpus petition pursuant to 28 U.S.C. § 2254 on February 17, 2011, seeking to challenge his 2002 convictions and sentences for first degree murder and armed criminal action, which were entered in the Circuit Court of Clay County, Missouri.

Petitioner raises fourteen grounds for relief: (1) that the trial court erred in overruling his objection to the testimony of Jaci Wiley "that petitioner had threatened her and discussed forming a mafia with James Boyd;" (2) that the trial court erred in not *sua sponte* intervening when the State "question[ed] witnesses about [violent] books owned by James Boyd;" (3) that trial counsel was ineffective in (a) failing to object to the State's introduction of Boyd's violent books into evidence, (b) asking petitioner about leafing through the books on direct examination, and (c) not objecting to the State's use of the books during cross-examination; (4) that trial counsel was ineffective in allowing video statements by witness Lindsay Harper to be used at trial, along with transcripts of the statement, which were given to the jury during both the trial and deliberations; (5) that trial counsel was ineffective in failing to object to the testimony of Randall Sanford, who was petitioner's

cell mate and who testified as to incriminating statements made by petitioner while they were in jail; (6) that direct appeal counsel was ineffective in failing to raise a claim on appeal that the trial court erred when Detective Dillenkoffer, a witness for the State, was allowed to testify at trial even though he had destroyed his notes of his interview with petitioner; (7) that direct appeal counsel was ineffective in failing to raise a claim on appeal that the trial court erred in overruling petitioner's motion to exclude Detectives Luster and Dillenkoffer's testimony because he had exercised his right against self-incrimination during their interviews with him; (8) that direct appeal counsel was ineffective in failing to raise a claim on appeal that petitioner's rights were violated when the the trial court refused to suppress the officers' testimony due to their notes not being preserved; (9) that direct appeal counsel was ineffective in failing to raise a claim on appeal that the trial court erred in allowing testimony of Randall Sanford when the written notes he gave to the State were never shown to the defense; (10) that the State elicited false testimony from witness Randall Sanford that "there had been no offers or promises of consideration for his testimony against petitioner with respect to Sanford's pending criminal charges," and "the State failed to disclose that [] a plea deal had been made with Sanford;" (11) that the State failed to disclose its knowledge from the trial of James Boyd that the victim's mother, Rebecca Caruthers, was providing Boyd with an alibi defense; (12) that the State failed to disclose its knowledge from the trial of James Boyd that Boyd, the person who allegedly stabbed the victim, suffered from Asperger's Syndrome, "which rendered Boyd incapable and too uncoordinated to single-handedly overpower and stab a victim twice his size and [made it impossible] that [Boyd] could [] have navigated the woods and led other[s] to the victim's body;" (13) that petitioner is actually innocent as shown cumulatively by the foregoing grounds for relief; and (14) that petitioner is innocent because James Boyd, the person who allegedly

-2-

stabbed the victim, has had his sentence reversed on appeal and has subsequently pled guilty to only second degree murder.

Respondent contends that grounds 1, 3-5, and 13-14 are without merit; that grounds 6-12 are procedurally defaulted because they were never fully presented in the state courts; and that ground 2 also is procedurally defaulted because the Missouri Court of Appeals did not engage in plain error review.

## SUMMARY OF FACTS

On appeal from the denial of petitioner's Mo. Sup. Ct. Rule 29.15 motion, the Missouri Court of Appeals summarized the facts as follows:

> The State charged [petitioner] with first-degree murder, section 565.020, n.1 and armed criminal action, section 571.015, for his part in the stabbing death of sixteen-year-old Jimmy Weber. The cause went to trial before a jury, and the following evidence was presented.
>
> > n.1 Statutory references are to the Revised Statutes of Missouri 2000 unless otherwise noted.
>
> In the fall of 1999, [petitioner] and some friends were planning an armed robbery of a local grocery store. They asked their friend Jimmy Weber to drive the "get-away" car, but he declined. At some point, Weber told the group that he had thrown away the stolen shotgun that they planned to use in the robbery. n.2 [Petitioner] and his co-conspirator, James Boyd, were angry about this and grew concerned that Weber would tell the police about the planned robbery. The two devised a plan to lure Weber into the woods and kill him.
>
> > n.2 A shotgun was found at Weber's home after his murder.
>
> On Saturday night, September 25, 1999, [petitioner] and Boyd were riding around with two other friends, Lindsay Harper and Adam Lile, in Lile's vehicle. They drove to Searcy Creek Parkway, and [petitioner] told Lile to pull over. [Petitioner] and Boyd got out of the

-3-

car and walked to a spot near where the group would later rendezvous and flee the murder scene. At [petitioner]'s suggestion, Lile then drove the group to Weber's home, and Weber joined them. They drove to a wooded area near some townhouses where [petitioner] had lived as a child. [Petitioner] suggested that they all go into the woods where he often had played. Harper and Weber were reluctant but eventually agreed. [Petitioner] led the group into the woods. Boyd, Lile, and Weber stopped near the top of a hill, but [petitioner] kept walking. Harper also stopped, unsure of what to do. [Petitioner] told her to come with him, and she followed him.

[Petitioner] and Harper stopped when they reached a clearing. Harper then heard Weber pleading for his life and crying. She asked Johnson what was happening, and Johnson said, "You know Jimmy's not coming out of the woods tonight." Lile saw Boyd pull a knife out from the waist of his pants and begin stabbing Weber. Boyd stabbed Weber a total of twenty-eight times in the neck, chest, abdomen, back, and arms while Weber pleaded for his life.

Boyd and Lile then joined [petitioner] and Harper in the clearing, and Boyd said, "It's done. Let's go." [Petitioner] asked Boyd, "What happened?" and Boyd said, "Jimmy's going to go the other way. Let's go." Boyd and [petitioner] disagreed about which direction to go. At [petitioner]'s insistence, they walked back the same way they had come "to avoid leaving a trail." As they walked past Weber lying on the ground, Harper heard [petitioner] say, "there's our boy," and Lile heard [petitioner] ask if anyone wanted a new pair of shoes. Weber then gasped, and the group ran from the scene. When they stopped, [petitioner] said he would go get the car. The group waited for [petitioner] atop a hill near Searcy Creek Parkway (a different spot from where they had entered the woods). [Petitioner] drove around to that location and picked them up. As they drove off, [petitioner] told the group that they needed alibis. He told Harper and Lile what their alibis should be.

The next day, another acquaintance, Aaron Clary, stopped by [petitioner]'s house. Boyd was there with [petitioner]. Boyd and [petitioner] had shared a duplex with Clary earlier that summer. When Clary asked about Weber, [petitioner] told him Weber was "underground." Clary did not know what that meant. At [petitioner]'s request, Clary agreed to let Boyd stay with him that night.

On the way to Clary's residence, Boyd told Clary that he had killed Jimmy Weber and left his body in the woods. Boyd said he and

-4-

[petitioner] planned the murder; Lile was there to prevent Weber from running and Harper was there to make Weber feel comfortable about going into the woods with them. Boyd told Clary that he and [petitioner]'s brother, Branden, had tried unsuccessfully to bury the body. He asked Clary to help him bury the body. Clary told Boyd he did not believe his story. The next day, Monday, Boyd led Clary into the woods and showed him Weber's body.

When Clary was able to extricate himself from Boyd, he went to see his attorney. Clary told his attorney what he had seen, and the attorney called the Clay County prosecutor. Clary's attorney arranged for the prosecutor and the county sheriff to meet Clary at the attorney's office. From there, Clary led the authorities to the woods, where they found Jimmy Weber's dead body. Near the body, officers found a shallow square-shaped depression in the ground that recently had been dug. They also found a shovel and a knife close by. [Petitioner], Boyd, and the others involved in the crime were arrested that evening.

Kansas City police officers arrested Lindsay Harper at college in Warrensburg. They brought her back to the police department in Kansas City, where she told them what had happened. She said she did not have any prior knowledge that the murder was going to happen. She gave a videotaped statement to police that included her claim that [petitioner] said: "You know Jimmy's not coming out of the woods tonight." She later gave a second videotaped statement in which she repeated that statement but also added other details about the night of the murder.

Police also arrested [petitioner] that Monday evening. After waiving his Miranda rights, [petitioner] gave the police three different stories. In his first two versions, he denied having any prior knowledge that Weber was going to be killed. [Petitioner] gave a third story after an officer told him his second story was not credible in light of others' statements. This time, [petitioner] said he and his friends became concerned that Weber was going to tell the police about their robbery plans. [Petitioner] said they decided to kill Weber so he could not tell anyone, and they planned the roles everyone would play when they took Weber into the woods: Boyd was to stab Weber, Lile was to block Weber's exit, and [petitioner] was to take Harper away so she could not see what was happening. [Petitioner] declined to make a videotaped statement.

At trial, Lile, Harper, Clary, and the detective who interviewed

[petitioner] testified consistent with the foregoing recitation of facts. The parties agreed to play Harper's two videotaped statements for the jury and to provide transcripts of the recordings.

[Petitioner] also testified. He said Boyd stabbed Weber while [he] and Harper were hiking ahead of the others. He said Boyd never told him why he did it. [Petitioner] said that the second time he heard Weber crying out, he said, "Oh my God, Jimmy might not leave the woods." [Petitioner] acknowledged that he had "thumbed through" some books belonging to Boyd about how to commit murder. [Petitioner] said it was Boyd who first suggested that they come up with alibis. [Petitioner] also called his brother, Branden, to testify. Branden said that Boyd showed him Weber's body and where the knife was hidden. He said Boyd asked him to help bury the body but he refused.

The State then called [petitioner]'s ex-girlfriend to rebut his testimony that he did not take Boyd's threats to harm people seriously. She stated that Boyd did what [petitioner] told him to do. She said [petitioner] once threatened that if she did not shut her mouth, Boyd would "take a bath in her blood," at which point, Boyd licked his knife. She also told the jury that [petitioner] and Boyd talked about forming their own mafia, or "gang type thing."

The State also called Randall Sanford as an additional rebuttal witness. Sanford had shared a jail cell with [petitioner]. According to Sanford, he and [petitioner] had discussed [petitioner]'s charges and the facts of the case. Sanford testified, *inter alia*, that [petitioner] had admitted to him that while [petitioner] was in the woods (at the time of the scream by Jimmy Weber coming a distance away in the woods), that [petitioner] did not say, "Oh my God, Jimmy might not leave the woods." Sanford testified that [petitioner] admitted to him that [petitioner] actually said, at that time, something more similar to what Harper had testified he said: "You know Jimmy's not coming out of the woods tonight." He also said that [petitioner] claimed to be the leader of the group that night, rather than Boyd, and admitted that they did it because they were afraid Weber would tell police about the robbery plan. [Petitioner] objected to Sanford's testimony on grounds that the State had not informed the defense about Sanford or about any statements [petitioner] allegedly had made to him. The court, after allowing [petitioner]'s attorney an opportunity for a brief interview with Sanford, and after requiring the prosecution to provide the defense with Sanford's criminal record, overruled [petitioner]'s objection based on surprise, and allowed Sanford's testimony.

-6-

> While in deliberation, the jury asked to see the transcripts of Harper's two statements, and the parties agreed to provide them. Ultimately, the jury found [petitioner] guilty of first-degree murder and armed criminal action, and the court sentenced him to concurrent terms of life without the possibility of parole and twenty-five years. . . .

(Petitioner's Exhibit R, pp. 1-6).

Before the state court findings may be set aside, a federal court must conclude that the state court's findings of fact lack even fair support in the record. Marshall v. Lonberger, 459 U.S. 422, 432 (1983). Credibility determinations are left for the state court to decide. Graham v. Solem, 728 F.2d 1533, 1540 (8th Cir. en banc 1984). It is petitioner's burden to establish by clear and convincing evidence that the state court findings are erroneous. 28 U.S.C. § 2254 (e)(1).[1] Because the state court's findings of fact have fair support in the record and because petitioner has failed to establish by clear and convincing evidence that the state court findings are erroneous, the Court defers to and adopts those factual conclusions.

## GROUND 1

Petitioner's first ground for relief is that the trial court erred in overruling his objection to witness Jaci Wiley's testimony "that petitioner had threatened her and discussed forming a mafia with James Boyd." (Doc. No. 1, pg. 24).

As respondent notes, petitioner faces a steep burden on this ground. Relief under 28 U.S.C. § 2254 must be predicated on a finding that petitioner's federal constitutional rights were violated. See § 2254. The Eighth Circuit has stated that, in order to constitute a Due Process violation under

---

[1]"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Case 4:11-cv-00188-HFS   Document 21   Filed 04/19/12   Page 7 of 36

the Fourteenth Amendment, an alleged evidentiary error in a state trial must have so "fatally infected the proceedings [that it] rendered [petitioner's] entire trial fundamentally unfair." <u>Anderson v. Goeke</u>, 44 F.3d 675, 679 (8th Cir. 1995).

On direct appeal, the Missouri Court of Appeals disposed of petitioner's first ground for relief as follows:

> [Petitioner] claims that the trial court erred in overruling his objection and permitting the testimony of Jaci Wiley, a State's rebuttal witness, that he had threatened her and had discussed on numerous occasions forming a mafia with James Boyd because the testimony was irrelevant to whether he aided and abetted the murder of Jimmy Weber, was collateral and highly inflammatory, and was prejudicial.
>
> **Standard of Review**
>
> The trial court is "vested with broad discretion to admit evidence at trial," and [the] reviewing authority will reverse the judgment only if the trial court's discretion was clearly abused. ***State v. Morrow*, 968 S.W.2d 100, 106 (Mo. banc 1998)**, ***cert. denied*, 525 U.S. 896 (1998)**. The trial court's decision to permit or deny the introduction of evidence is reviewed "for prejudice, not mere error, and will [be] reverse[d] only if the error was so prejudicial that it deprived the defendant of a fair trial." ***Id.* (quoting *State v. Taylor*, 918 S.W.2d 753, 761 (Mo. banc 1996)**, ***cert. denied*, 519 U.S. 933 (1996))**. . . .
>
> **Discussion of Point I**
>
> Assuming for discussion, without deciding, that the testimony of Jaci Wiley was inappropriate, the question is whether the testimony was outcome determinative. Did Jaci Wiley's testimony that she was threatened by [petitioner] and Mr. Boyd in an unrelated occurrence and that the two men talked on numerous occasions about forming a mafia prejudice the jury such that the outcome of the trial would have been different except for her testimony? The evidence at the crime scene, the testimony of Lindsay Harper and Aaron Clary, and the confession of [petitioner] overwhelmingly established his guilt beyond a reasonable doubt. When improper evidence is harmless beyond a reasonable doubt, the error in its admission is harmless, having no impact on the judgment. ***State v. Sage*, 977 S.W.2d 65, 72 (Mo. App. W.D. 1998)**. The error in permitting Jaci Wiley to testify

-8-

about being threatened by [petitioner] and Mr. Boyd, and her testimony that [petitioner] and Mr. Boyd had discussed forming a mafia, if it was error, was harmless beyond a reasonable doubt because of the overwhelming evidence of guilt. Point I is denied.

(Respondent's Exhibit K, pp. 5-7).

The resolution of ground 1 by the state court did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2) (as amended April 24, 1996), as defined by the Supreme Court in <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000).[2]

Ground 1 is denied.

## <u>GROUND 2</u>

Petitioner's second ground for relief is that the trial court erred in failing to intervene *sua sponte* when the State questioned witnesses, including petitioner, using excerpts from violent books. Specifically, the record in this case reveals that the State cross-examined petitioner about three violent books owned by James Boyd, petitioner's co-defendant: (1) <u>Effective Techniques for Unarmed Combat</u>; (2) <u>Kill Without Joy, the Complete How-to-Kill Book</u>; and (3) <u>Hit Man, a Technical Manual for Independent Contractors</u>. (State's Exhibit F, Trial Transcript, pp. 808-10). On

---

[2]According to the concurrence of Justice O'Connor, joined by four other members of the Court, "under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413.

Case 4:11-cv-00188-HFS   Document 21   Filed 04/19/12   Page 9 of 36

cross-examination, petitioner acknowledged that he had "thumbed through them a couple of times." (Pg. 808). Ultimately, the books were not offered into evidence by the State, as seen by the jury's fruitless requests to see them during deliberations. (Respondent's Exhibit F, pg. 954).

The Missouri Court of Appeals declined to review petitioner's second ground for relief under its plain error review standard. Mo. Sup. Ct. Rule 30.20 provides that review of unpreserved claims is discretionary and "may be considered in the discretion of the court . . ." The decision to decline review of ground 2 is binding on this Court, because an independent and adequate state procedural bar to review of a claim operates to similarly bar review of the claim in federal habeas proceedings. See Walker v. Martin, __ U.S. __, 131 S. Ct. 1120, 1127 (2011). A discretionary rule such as the plain error standard must be "firmly established" and not be applied in an unforeseeable way on a particular appellant in order to bar federal review. Id. at 1129-30.

On direct appeal, the Court of Appeals analyzed whether it would review petitioner's second ground for relief as follows:

> [T]he first consideration in determining whether plain error occurred is evaluating whether the trial court committed error, affecting substantial rights, that was evident, obvious, and clear. *Id.* If evident, obvious and clear error is recognized, the second step requires that the court determine whether manifest injustice or a miscarriage of justice resulted therefrom. ***Id.***

> **Discussion of Point II**

> During opening statement, defense counsel spoke of Jim Boyd, informing the jury that it would hear that he was called "Jimmy two-knives" because he carried two knives. Counsel also stated that Jim Boyd "read books about military things and talked about the CIA and those sorts of things. He also talked about hurting people, and nobody paid any attention to him because he never carried out any of these threats." The apparent strategy of the defense was to convince the jury that [petitioner] was unaware of what would happen the evening that Jimmy Weber was killed; that Mr. Boyd was the evil culprit who

-10-

committed the murder and was inclined to kill people, having read how-to books about killing people and equipped himself with knives to do it; and that because of Mr. Boyd's frequent threats to hurt various people with which he never followed through, [petitioner] had no reason to believe that Mr. Boyd would stab Mr. Weber to death. The evidence that the books existed, were owned by Mr. Boyd, and that he, [petitioner], and Mr. Clary had read them was admitted into evidence by Mr. Clary's unobjected to testimony during the State's case-in-chief. [Petitioner], during his direct examination, testified that the books had been left at his mother's house where he was then living and that he had leafed through them.

The trial court's failure to sua sponte intervene and preclude the prosecutor from eliciting evidence about the books that Jim Boyd owned and read, that defense counsel commented about during opening statement, and that were discussed during [petitioner]'s direct testimony did not constitute evident, obvious, and clear error. Point II is denied.

(Respondent's Exhibit K, pp. 8-9).

The Court of Appeals did not find evident, obvious, and clear error which would satisfy the first requirement for plain error review, and therefore did not continue on in reviewing petitioner's claim. Under this firmly established procedural rule in Missouri, petitioner's claim is now barred from review in this Court.

Petitioner suggests that Walker created a "new" constitutional rule that is not retroactive to his case, since Walker was handed down well after his 2002 conviction. Even assuming *arguendo* that petitioner is correct, and therefore that the ground may not be procedurally defaulted since the Court of Appeals at least in part reviewed it, ground 2 is without merit. The Court of Appeals was well within reason in finding that the trial court did not err in failing to intervene *sua sponte* after defense counsel himself opened the door to use of the books by the State. Counsel made a strategic decision to preempt the State's use of the books by discussing them in opening arguments and his direct examination of petitioner. Counsel's strategic decision is best analyzed under the standard of

-11-

ineffective assistance of counsel (ground 3), as opposed to error by the trial court (ground 2). Ground 2 is at best a mis-characterized claim.

Ground 2 is denied.

## GROUNDS 3 & 4

Petitioner's third and fourth grounds for relief concern ineffective assistance of trial counsel. In his third ground for relief, petitioner contends that trial counsel was ineffective in how he dealt with the books discussed in ground 2. Specifically, petitioner contends that counsel should have objected to the introduction of the books into evidence, objected to the State's use of the books during cross-examination, and should not have asked petitioner about leafing through the books on direct examination. In his fourth ground for relief, petitioner contends that trial counsel was ineffective in not objecting to the use of videotaped statements by witness Lindsay Harper, and in not objecting to the jury's use of transcripts of the statement.

Federal habeas review of petitioner's ineffective assistance of counsel claim is "doubly deferential." Knowles v. Mirzayance, 556 U.S. 111, 129 S. Ct. 1411, 1420 (2009). First, petitioner must overcome the high bar of Strickland v. Washington, 466 U.S. 668 (1984), by showing that (1) counsel's performance fell below an objective standard of reasonableness; and (2) petitioner was sufficiently prejudiced such that "the result of the proceeding would have been different." Id. at 688, 694. Second, under 28 U.S.C. § 2254, petitioner must show that the state court's adjudication of his ineffective assistance claim was "unreasonable." Harrington v. Richter, ___ U.S. ___, 131 S. Ct. 770, 788 (2011). Both the Strickland standard and the standard set forth in § 2254 are highly deferential. Ultimately, "[t]he question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 131 S. Ct. at 788.

-12-

On appeal from the denial of petitioner's Mo. Sup. Ct. Rule 29.15 motion, the Missouri Court of Appeals disposed of grounds 3 and 4 as follows:

[ground 3]

### Evidence of Violently Themed Books

[Petitioner] says the motion court erred in denying his claim that his trial counsel was ineffective for failing to object when the State introduced evidence of Boyd's violently-themed books, for bringing out on direct-examination that [petitioner] had "leafed through" those books, and for failing to object when the State cross-examined [petitioner] about reading the books.

At trial, defense counsel first alluded to violently themed books in his opening statement. After characterizing Jim Boyd as a "blow-hard" who collected knives and talked about "videotapes that taught how to kill and bomb," counsel said: "You will hear that [Boyd] read books about military things and talked about the CIA and those sorts of things."

Later, the State elicited testimony from Aaron Clary that Boyd owned books entitled *Kill Without Joy, the Complete How-to-kill Book*; *Hit Man, the Manual for Independent Contractors*; and *Effective Techniques for Unarmed Combat* when they lived at the duplex and that he had seen [petitioner] reading them. Defense counsel did not object. On cross-examination, Clary said everyone in the group had read them, including Adam Lile and Jimmy Weber.

When [petitioner] took the stand, his attorney asked him about the books. [Petitioner] said he had "leafed through" them when he, Boyd, and Clary lived together at the duplex. On cross-examination, the State asked [petitioner] about each specific book. [Petitioner] said he had "thumbed through" and "read through" some of the books but did not recall their specifics. When the prosecutor attempted to refresh his memory by reading an inflammatory passage from *Hit Man* aloud, defense counsel objected stating that [petitioner] did not remember the books' specifics. The court sustained the objection. The State then asked [petitioner] if he had read the "lesson on knifework" in *Kill Without Joy*. [Petitioner] said he did not recall reading specifics from the book or remember pictures about stabbing someone. When the prosecutor asked if a particular picture was remarkably similar to how the victim had been stabbed, defense

counsel again objected, and the court sustained. Later, the prosecutor asked [petitioner] if he would use Boyd, "the guy that read the book *Hit Man*," as a hit man. [Petitioner] said he would not, because no one took Boyd seriously when he read such books or talked about such things.

In his 29.15 motion, [petitioner] claimed that defense counsel was ineffective in handling this issue. Trial counsel testified that the defense strategy was to show that Boyd alone was responsible for the murder. He said the books "absolutely fit into our defense that my client was not the violent person, that Jim Boyd was in fact the violent person, and not only was he a violent person, he had violent literature in the house." Counsel believed that the books would come into evidence regardless of whether he objected, and he wanted to present them in the best possible light; he did not want to look like he was trying to hide them from the jury.

In denying this claim, the motion court found that it was defense counsel's trial strategy not to object to mention of the books and to question [petitioner] about them on direct examination to support his theory of the case. The motion court found that the trial record supported the belief that the books would have been admitted over any objection made by defense counsel, noting Clary's testimony that he had seen [petitioner] reading the books. Because counsel's actions were the result of trial strategy, the motion court found no basis for post-conviction relief.

The motion court did not err in so finding. The transcript from the criminal trial and the record of the evidentiary hearing both show that counsel's failure to object to the book evidence and decision to question [petitioner] about it was based on trial strategy. Counsel sought to connect the books to Boyd and to argue that he was the violent person who committed the murder without anyone else's prior knowledge. Moreover, counsel did object when the State went too far in trying to connect the books to [petitioner], and the objections were sustained.

"Ineffective assistance of counsel is rarely found in cases of a failure to object." *Williams v. State*, 205 S.W.3d 300, 305 (Mo. App. 2006). Failure to object does not constitute ineffective assistance "unless admission of the objectionable evidence resulted in a substantial deprivation of movant's right to a fair trial." *Harrison v. State*, 301 S.W.3d 534, 538-39 (Mo. App. 2009). "If a failure to object … is based on reasonable trial strategy, then no ineffective assistance of

-14-

counsel can be shown." *Williams*, 205 S.W.3d at 305. Reasonable choices of trial strategy cannot serve as the basis for an ineffective assistance claim. *Anderson v. State*, 196 S.W.3d 28, 33 (Mo. banc 2006). Counsel is not ineffective for pursuing one reasonable trial strategy to the exclusion of another. *Id.* [Petitioner] does not demonstrate that this strategy was not reasonable.

In any event, to prevail on this claim, [petitioner] had to show that an objection would have been upheld if made. *Glass v. State*, 227 S.W.3d 463, 473 (Mo. banc 2007). He fails to do so. The book evidence was relevant and, thus, admissible, because it showed a source of knowledge for [petitioner]'s and Boyd's scheme to kill Weber. The State's theory was that [petitioner] and Boyd conspired to kill Weber and that [petitioner] essentially used Boyd as the "weapon" to do so. Even if [petitioner] had not read the books, the fact that he knew Boyd had read them supported this theory. Thus, [petitioner] fails to show that there was a viable objection that could have been made. Counsel is not ineffective for failing to make a non-meritorious objection. *Id.*

Because trial counsel's handling of the book evidence was trial strategy and because the evidence was admissible, the motion court did not err in denying this claim. Point denied.

[ground 4]

## Admission of Lindsay Harper's Statements

[Petitioner] also says the motion court erred in denying his claim that trial counsel was ineffective for agreeing to play Lindsay Harper's videotaped statements at trial and providing transcripts for the jurors, and for agreeing to send the transcripts to the jury during deliberations.

Lindsay Harper first gave a videotaped statement when she was arrested on September 28, 1999. She was charged with first-degree murder and armed criminal action at that time. On August 17, 2000, she gave a second videotaped statement in conjunction with her agreement to plead guilty to the lesser charge of abandonment of a corpse. n.3

> n.3 Though the State had asked for a five-year sentence, the court placed Harper on probation.

-15-

Harper's two statements contained much of the same information. She said in both, for example, that [petitioner] told her, "You know Jimmy's not coming out of the woods tonight," and that he instructed the others to come up with alibis. But her second statement also contained additional details that were not in the original. In her second statement, Harper said [petitioner] initially told her, on the night of the murder, that she "might not want to come over." She also said she overheard Boyd tell [petitioner] that things were "falling apart" and that the two discussed whether they could "still do this." She revealed that the group had made the initial trip out to Searcy Creek Parkway before going to pick up Jimmy Weber. She also said she was afraid to go into the woods and that [petitioner] talked her into it. Harper recounted in her second statement that Boyd said, "It's done," after the stabbing and that [petitioner] said, "There's our boy" as they walked past Weber's body. She also said [petitioner] asked her after the murder if she could "stand up to interrogation" and that she was afraid of [petitioner].

Harper's videotaped statements also differed from her trial testimony in at least one important respect: in both statements, she indicated that [petitioner] said "Jimmy's not coming out of the woods tonight" before she heard Jimmy cry out; at trial, she told the jury that [petitioner] said it after they heard Jimmy's cries.

At trial, defense counsel agreed to admit both videotaped statements and their transcripts. Both videotapes were played and transcripts were temporarily provided to the jurors. In his closing argument, defense counsel told the jury to consider Harper's story and to ask for her videotaped statements. He said:

> Remember the second statement with all the extra stuff in it occurred the day she was allowed -- she had to do it before she was allowed to enter her guilty plea. Listen to those two statements. Compare those two statements. See exactly what was said in there. Look at all the new information that went in as a result of the plea offer in her case, taking it down from life in prison to five years in prison.

During deliberation, the jury did ask for Harper's two videotaped statements. The parties agreed to give the jury transcripts of the statements instead.

-16-

[Petitioner] claimed in his 29.15 motion that trial counsel was ineffective in agreeing to the admission of this evidence. At the evidentiary hearing, trial counsel explained that there were inconsistencies between Harper's statements and that it "appeared as though the statements had improved once she had a plea offer." Counsel said Harper's later statement made appellant "look more culpable." Counsel explained that he had to be cautious in cross-examining Harper, because she "was a fragile sort of delicate-approach witness" who "had a lot of jury appeal." He thought that showing the videotapes to the jury would allow him to impeach her credibility "in a kind of kid-glove approach." Counsel said his handling of Harper's statements was "absolutely, trial strategy" and that the videotapes "absolutely" helped him attack her credibility. Counsel believed that the videotapes had more impact than simple cross-examination would have had.

The motion court denied this claim, finding that counsel's motivation for playing the videotapes and allowing the jury to review transcripts of the statements during deliberations was trial strategy and did not provide a basis for post-conviction relief.

The motion court did not err. Defense counsel's testimony at the evidentiary hearing, and the trial record itself, made clear that counsel presented both statements to suggest that Harper invented new incriminating evidence against [petitioner] as part of her plea agreement. [Petitioner] says counsel could have done this via cross-examination, but counsel felt that it would be more effective for the jury to hear and see the actual statements. By actually seeing the transcripts, he thought, the jury could see the details that Harper added prior to her plea.

[Petitioner] says this strategy was unreasonable because rather than helping impeach Harper's credibility, it had the effect of reinforcing the incriminating evidence that appeared in both statements. We disagree. Neither the fact that the second statement may have reiterated some parts of the first, or even the fact that some aspects of Harper's statements were more incriminating than her trial testimony, renders this strategy unreasonable *per se* or automatically constitutes ineffective assistance of counsel. "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "Reasonable choices of trial strategy, no matter how ill-fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance." *Anderson*, 196 S.W.3d at 33. Counsel is not ineffective for pursuing one reasonable strategy to the exclusion of another. *Id.*

-17-

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. [Petitioner] has not persuaded us that counsel's strategy was unreasonable. As noted in *Strickland*, "There are countless ways to provide effective assistance in any given case." *Id.* "Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.*

Even if counsel's actions were deficient, *Johnson* does not demonstrate that he was prejudiced by them. He testified himself that he said Jimmy Weber would "not leave the woods," and his explanation that it was simply an expression of shock upon hearing Weber's cries was implausible. The normal reaction, upon hearing unexpected screams, would be to express surprise and concern, such as: "What's going on?" or "What was that?" and perhaps even going to see what had happened. [Petitioner]'s statement that Jimmy would not leave the woods -- regardless of whether it came before or after hearing his cries -- indicated that he knew before going into the woods that Boyd intended to kill Jimmy while they were there.

Furthermore, in ruling on [petitioner]'s direct appeal, we found that "the evidence at the crime scene, the testimony of Lindsay Harper and Aaron Clary, and the confession of [petitioner] overwhelmingly established his guilt beyond a reasonable doubt." *See Johnson*, 135 S.W.3d 535, mem. op. at 6. [Petitioner] fails to establish that he was prejudiced by counsel's perceived deficiencies in light of this overwhelming evidence of guilt.

Because trial counsel's actions were based on reasonable trial strategy and because [petitioner] is unable to show prejudice, the motion court did not err in denying this claim.

Point denied.

Johnson v. State, 330 S.W.3d 132, 138-41 (Mo. App. W.D. 2010).

The resolution of grounds 3 and 4 by the state court did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an

-18-

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2) (as amended April 24, 1996), as defined by the Supreme Court in Williams, 529 U.S. at 412. Applying the Richter standard of review to the facts as set forth in the record, a reasonable argument can be made that counsel's actions did not fall outside of the wide spectrum of allowable representation under Strickland. Richter, 131 S. Ct. at 788.

Grounds 3 and 4 are denied.

## GROUND 5

In his fifth ground for relief, petitioner contends that direct appeal counsel was ineffective in failing to argue trial court error for allowing the testimony of Randall Sanford, the State's second rebuttal witness. Here, counsel's performance on direct appeal may be analyzed under the same "doubly deferential" standard of review set forth previously. See Mirzayance, 129 S. Ct. at 1420.

On appeal from the denial of petitioner's Mo. Sup. Ct. Rule 29.15 motion, the Missouri Court of Appeals disposed of ground 5 as follows:

> In point III, [petitioner] says the motion court erred in denying his claim that his appellate counsel was ineffective for failing to argue that because the State violated its discovery duty under Rule 25.03 in not disclosing the [petitioner]'s statements allegedly made to Randall Sanford, the trial court erred in allowing the State to call Randall Sanford as a rebuttal witness. [Petitioner] says he was prejudiced by counsel's ineffectiveness, because a reasonable probability exists that the result of the direct appeal would have been different had counsel raised this issue.

> To prove ineffectiveness of appellate counsel, [petitioner] had to show that counsel failed to raise a claim of error on appeal that a competent and effective lawyer would have recognized and asserted. *Anderson*, 196 S.W.3d at 36. The movant "must show that the claimed error [was] sufficiently serious to create a reasonable probability that, if it was raised, the outcome of the appeal would

-19-

have been different." *Id.* "The right to relief [on such a claim] inevitably tracks the plain error rule;" thus, the movant must show that "the error that was not raised on appeal was so substantial as to amount to a manifest injustice or a miscarriage of justice." *Middleton v. State*, 80 S.W.3d 799, 808 (Mo. banc 2002).

After the State and the defense had rested their cases in chief, the State called Sanford. Defense counsel objected on grounds that the State had not listed him as a witness nor provided any discovery about him. The trial court instructed the State to tell the defense who Sanford was and what he was expected to say. The State said that Sanford was [petitioner]'s cellmate and that [petitioner] had talked to him about the facts of the case. The prosecutor said that "Sanford would not be called as a rebuttal witness if the defendant had not testified, but Mr. Sanford will specifically rebut the specifics of what [petitioner] said he did not say or did not do from the witness stand." The court directed the State to give the defense a copy of Sanford's criminal record for impeachment purposes. During a recess, the court allowed defense counsel time to speak with Sanford. The court then allowed Sanford's testimony over objection, on the basis that he was a rebuttal witness.

Sanford testified that [petitioner] told him that he and Boyd had killed Jimmy Weber because they were afraid he would report their robbery plans. He said [petitioner] told him that Harper and Lile did not know that the murder was going to happen. Sanford said [petitioner] told him he was going to testify that, after hearing Weber scream, he said, "Oh, my God, Jimmy's not coming out of the woods." Sanford also said [petitioner] claimed to be the leader of the group. [Petitioner] told Sanford that he had told the others they would need alibis but that he was going to testify that Boyd had said it. Sanford also said [petitioner] admitted that he stole a shotgun from the home of a girl named Diane, which was consistent with evidence presented at trial. Sanford acknowledged that he hoped to receive favorable treatment in his own prosecution as a result of his testimony. n.4

> n.4 In the midst of Sanford's testimony, he revealed that he had taken written notes with him when he went to meet with the prosecutors. The court ordered the State to produce those notes and give them to the defense. After a lengthy discussion

about whether or not the notes had been destroyed (and if so, by whom), the court eventually concluded that they had been destroyed by Sanford's attorney. Sanford continued testifying.

Rule 25.03(A)(2) requires the State, upon written request, to disclose to defense counsel "[a]ny written or recorded statements and the substance of any oral statements made by the defendant [and] a list of all witnesses to the making[.]" [Petitioner] alleged that trial counsel failed to identify the rule number and objected only that he had never heard of the witness. The motion court found, as to that claim, that counsel's objection, while not reciting the actual rule number, was sufficient to invoke the rule. We agree.

[Petitioner] claimed in his 29.15 motion that appellate counsel was ineffective for failing to argue on direct appeal that the State violated Rule 25.03(A)(2) when it failed to disclose Randall Sanford as a witness and [petitioner]'s alleged statements to him. The motion court's denial of that claim is the basis of this point on appeal.

At the evidentiary hearing, trial counsel testified that he had never heard of Sanford until the State called him to testify, had received no discovery regarding him, and had no indication that Sanford had information about statements made by his client. Counsel said the court gave him thirty-five minutes to go to the jail to talk to Sanford before his testimony. Counsel said much of that time was spent waiting for Sanford. Counsel claimed that he did not have enough time to prepare his cross-examination. He pointed out that he objected to Sanford's testimony but that the objection was overruled.

When appellate counsel testified, she acknowledged that she did not raise any claim of error in letting Randall Sanford testify or any argument that Rule 25.03(A)(2) was violated. She said that she "just missed it." She now is more familiar with the part of Rule 25.03 that requires the State to divulge oral or written statements, she said.

The motion court denied [petitioner]'s claim. The court found that he failed to show that the claim he says appellate counsel should have raised would have required reversal had it been asserted. The court pointed to the fact that Sanford's testimony "was offered to rebut inconsistencies in [petitioner's] testimony" and observed that the subject matter of Sanford's testimony already had been offered through Aaron Clary, Lindsay Harper, and the police detective to

-21-

whom [petitioner] had confessed. n.5

> n.5 Neither party has purported to delineate precisely how much of Sanford's testimony could properly be called rebuttal and how much was simply consistent with other prosecution testimony. We believe Sanford's testimony did include what could properly be considered rebuttal, at least to the extent that it dealt with what [petitioner] stated in the woods at the time of the scream and to the extent that it dealt with [petitioner]'s leadership of the group that night. It is important to recognize that the mere fact that evidence as to an admission of the defendant does not make it rebuttal merely because the defendant chooses to testify. *See*, *e.g.*, *State v. Kehner*, 776 S.W.2d 396, 398-99 (Mo. App. 1989). At the time the testimony was presented, defense counsel did not clearly articulate an objection related specifically to the extent that the testimony of Sanford might have exceeded actual rebuttal. In any event, of course, we agree with the appellant that, rebuttal or not, such testimony is required to be disclosed in discovery pursuant to Rule 25.03.

[Petitioner] says this was error. He says that a reasonably competent appellate attorney would have argued on appeal that the State violated Rule 25.03(A)(2) and that the trial court erred in allowing the State to call Sanford to testify. Had appellate counsel raised this issue, he argues, this court would have been compelled to grant a new trial. He cites *State v. Willis*, 2 S.W.3d 801 (Mo. App. 1999), and *State v. Gonzalez*, 899 S.W.2d 936 (Mo. App. 1995), two cases in which convictions were reversed on appeal after the State introduced incriminating statements the defendant had made to others without first disclosing the existence of those statements to defense counsel.

In *State v. Willis*, 2 S.W.3d 801, 802 (Mo. App. 1999), the defendant

-22-

was charged with involuntary manslaughter in the death of his baby daughter. At a pre-trial hearing on the day the trial started, the prosecutor referred to two letters Willis had written to his wife from jail that contradicted his planned defense. *Id.* at 803. The court allowed the letters for purposes of the hearing. *Id.* The next morning, defense counsel objected to the State's use of the letters during trial, claiming that the State's failure to timely disclose the letters violated discovery rules. *Id.* The State justified its failure to disclose by claiming that it did not intend to use the letters unless Willis testified. *Id.* The trial court found that the State had not complied with Rule 25.03(A)(2) but that Willis was not prejudiced. *Id.* The trial court allowed the letters to be used at trial, and the State used the letters as a significant part of its cross-examination of Willis. *Id.* Willis argued on appeal that the State's failure to timely disclose the two letters until the morning of trial violated Rule 25.03(A)(2), "disabled the defense to which he was already committed," and "affected the verdict." *Id.* He claimed that the trial court abused its discretion in permitting the State to use the letters. *Id.* The appellate court noted that it will reverse if the defendant demonstrates that the State's failure to timely disclose "results in fundamental unfairness." *Id.* The appellate court concluded that the State's failure to disclose the letters was a violation of Rule 25.03(A)(2) and did result in fundamental unfairness in that it prevented the defendant from having all the information necessary to prepare his defense for trial. *Id.* at 806-07. The court rejected the State's various arguments regarding a lack of prejudice, and reversed and remanded for a new trial. *Id.* at 808-09.

In *State v. Gonzalez*, 899 S.W.2d 936 (Mo. App. 1995), the defendant was on trial for second-degree murder and armed criminal action. The court allowed the State to cross-examine Gonzalez about an admission he purportedly had made to a fellow inmate, despite defense counsel's objection that no such statement had been disclosed to him prior to trial. *Id.* at 937. Gonzalez was convicted on both counts. *Id.* at 936. On appeal, he argued that the trial court erred in allowing the State to question him about the undisclosed statement. *Id.* at 937. In response to the State's argument that Gonzalez did not show how timely disclosure would have helped him, the appellate court pointed out that counsel "would at least not have been surprised by the questions" and "would have been equipped to repair any damage done, or perceived to have been done, by the prosecutor's questions." *Id.* at 938. The court concluded that the prosecutor's failure to disclose the alleged statement combined with an improper jury argument to prejudice the defendant and warranted reversal and

-23-

a new trial. *Id.*

[Petitioner] says the State's discovery violation prevented him from making an informed and voluntary decision about whether to testify at trial and also deprived him of an opportunity to investigate Sanford's claims, prepare to cross-examine him, or locate witnesses who could have refuted his claims. [Petitioner] says he was prejudiced because this court would have reversed his convictions if the discovery violation had been raised on direct appeal. [Petitioner]'s evidence at the evidentiary hearing, while demonstrating surprise, did not, however, demonstrate that [petitioner]'s defense was altered in any way. The evidentiary hearing was the proper time to present testimony showing that the discovery violation created not only surprise, but fundamental unfairness.

The State, while conceding that the prosecutor's failure to disclose [petitioner]'s statements to Sanford was a discovery violation, says that this does not automatically mean the claim requires reversal. The State argues that [petitioner] fails to establish that the violation resulted in "fundamental unfairness." The State says that "[a]ppellate courts will intervene [in such a case] only where a defendant shows that the failure to make a timely disclosure resulted in fundamental unfairness." *State v. Jamison*, 163 S.W.3d 552, 557 (Mo. App. 2005). "Fundamental unfairness," says the State, "turns on whether there was a reasonable likelihood that an earlier disclosure … would have affected the result of the trial." *Id.* "Fundamental unfairness occurs when the State's failure to disclose results in defendant's 'genuine surprise' and the surprise prevents meaningful efforts to consider and prepare a strategy for addressing the evidence." *State v. Thompson*, 985 S.W.2d 779, 785 (Mo. banc 1999).

In *Thompson*, the Supreme Court addressed allegations of discovery violations by the State in the guilt phase of a capital murder case. *Id.* at 784. The defendant there failed to identify any specific ruling of the trial court as to the discovery issues in question. *Id.* The Court also noted that the defendant did not specify, either on appeal or before the trial court, how further investigation or preparation would have benefited his defense. *Id.* at 785. The Court concluded that the "[d]efendant's bare assertions of prejudice are not sufficient to establish fundamental unfairness nor do they demonstrate how the outcome of the case was substantively altered." *Id.*

The Court in *Thompson*, however, also addressed allegations of discovery violations in connection with the penalty phase of the case.

-24-

In appellant's point I as to the penalty phase, the defendant contended that he was caught by surprise when his former wife testified that the defendant, in a previous incident, had "shot someone he had seen 'messing with his car.'" *Id.* at 792. The State admitted that it failed to disclose to the defendant that it intended to introduce evidence about the incident. *Id.* Although the defendant objected on grounds of non-discovery immediately after the ex-wife's testimony concluded, the defendant had failed to object contemporaneously with the ex-wife's testimony about the incident. *Id.* Review, therefore, was for plain error pursuant to Rule 30.20. *Id.*

Because of the significance of the testimony (which defendant was not prepared to rebut) about an act of violence with a deadly weapon that was also an act of "unreasonable territoriality," and because of "the totality of the circumstances" (which included the fact that this was the sentencing phase of a capital case in which a death penalty had been imposed), the court found a manifest injustice or miscarriage of justice. *Id.* Without specifying exactly how the non-disclosure presumably affected the defense's strategy or otherwise affected the fairness of the proceeding, the Court reversed the death sentence and remanded for a new sentencing hearing. *Id.*

This case does not involve the penalty phase of a capital case, as in *Thompson*. Nor does it involve a case in which there were (presumably) no eyewitnesses as to any of the circumstances of death (the death of an infant child), as in Willis. Nor was the non-disclosure here combined with the prejudicial effect of an improper jury argument, as was the case in Gonzalez. As far as the ruling in *Thompson* related to the guilt phase discovery violations, the Court seems to indicate that the defendant-appellant must be able not only to articulate the specific discovery violation but also to indicate how the violation prejudiced the defendant's defense. *See Thompson*, 985 S.W.2d at 785.

The evidence of [petitioner]'s knowing and active participation in the murder was strong even without Sanford's testimony, and [petitioner] does not articulate exactly what the defense would have done differently had it known about Sanford. It is true that [petitioner]'s attorney had very little practical opportunity, once receiving notice, to develop a strategy to address the testimony. n.6 But the question is whether the motion court should have believed that, had appellate counsel selected the non-disclosure of Sanford as a point to argue, there is a reasonable probability that counsel would have been able to obtain a reversal of the conviction.

Case 4:11-cv-00188-HFS   Document 21   Filed 04/19/12   Page 25 of 36

n.6 Neither of the parties chooses to discuss how [petitioner]'s strategic maneuvers might have been affected by the fact that [petitioner] had undergone two previous trials before this trial, and we lack knowledge of the details ourselves. The motion court also did not address the matter. We are left with the assumption that neither party saw any constraints (based on any testimony [petitioner] may have given at prior trials) as particularly relevant.

[Petitioner] argues that "the state's failure to disclose result[ed] in defendant's 'genuine surprise' and the surprise prevent[ed] meaningful efforts to consider and prepare a strategy for addressing the evidence." *See id.* at 785. We suppose that, advance notice of Sanford or not, the defense would have done at least what was done here: attacking Sanford's testimony by showing his own criminal history and his hope for favorable treatment from the prosecution.

This is a post-conviction motion case. We are not now reviewing the actions of the trial judge in this case, other than to judge whether this court would likely have reversed the trial court if the discovery violations had been effectively raised and argued in the direct appeal. As to that issue, we can say that a reversal would not have been outside the realm of possibility if counsel had been able to persuade this court that the discovery violation regarding Sanford was in bad faith and if this court had believed, in view of all the circumstances, that the failure to provide notice of Sanford's evidence created a fundamental unfairness. But we cannot say, on this record, that a reversal of the conviction on the direct appeal would have been reasonably probable. *See*, *e.g.*, *Anderson*, 196 S.W.3d at 36. Nor can we say that the record shows clearly that the discovery violation created fundamental unfairness in some other way to such a degree that this court would have been reasonably likely to reverse the conviction.

It is difficult to establish fundamental unfairness or to demonstrate how the case's outcome was substantively altered by the failure to disclose where there is overwhelming evidence of guilt, because that factor is part of what the court must consider. *See Jamison*, 163 S.W.3d at 557. Here, there was overwhelming evidence of

-26-

[petitioner]'s guilt. That evidence included his own statements at the time of the murder, which showed his prior knowledge of the plan to kill Jimmy Weber; his remarks about the victim's body, which were inconsistent with those that would be expected from an innocent bystander; his confession to the police; and the testimony of Harper, Lile, Clary, and the interrogating detective. The impropriety of the non-disclosed rebuttal evidence was not highly evident to the trial judge at the time nor to the appointed appellate defense counsel assigned to the appeal. n.7 Neither client nor counsel testified at the post-conviction hearing as to how the non-disclosed testimony frustrated the defense strategy or would have affected it if counsel had received proper notice.

> n.7 The only testimony at all in regard to prejudice was the belated speculative opinion of appellate defense counsel that, in light of the fact that there was a hung jury in previous trials, perhaps a trial court ruling excluding Sanford's testimony altogether could have resulted in a defense verdict. There was no testimony as to how the non-disclosure of Sanford would have affected the strategy of the defense.

For all these reasons, we cannot say that the motion court "clearly erred" in denying [petitioner]'s motion. The point is denied.

Johnson v. State, 330 S.W.3d 132, 141-47 (Mo. App. W.D. 2010).

The resolution of ground 5 by the state court did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2) (as amended April 24, 1996), as defined by the Supreme Court in Williams, 529 U.S. at 412. Applying the Richter standard of review to the facts as set forth in the record, a reasonable argument can be made that counsel's actions did not fall outside of the wide spectrum

-27-

of allowable representation under <u>Strickland</u>. <u>Richter</u>, 131 S. Ct. at 788.

Ground 5 is denied.

<u>**GROUNDS 6-14**</u>

Petitioner's sixth through ninth grounds for relief concern ineffective assistance of counsel on direct appeal; his tenth through twelfth grounds concern what is construed as prosecutorial misconduct; and his thirteenth and fourteenth grounds concern his alleged actual innocence. (<u>See</u> grounds for relief, listed *supra* pp. 1-2). As seen below, respondent correctly maintains that grounds 6-12 are procedurally defaulted, and that grounds 13-14 do not satisfy the high threshold for a claim of actual innocence.

**A.** *Petitioner Has Procedurally Defaulted Grounds 6-12*

In <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991), the Supreme Court held:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

<u>Id.</u> at 750. Cause, actual prejudice, and the probability of a "fundamental miscarriage of justice" are to be judged under criteria set out in <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977), and <u>Murray v. Carrier</u>, 477 U.S. 478 (1986). <u>Coleman</u>, 501 U.S. at 748-50.

A review of the record reveals that petitioner defaulted grounds 6-12 by not raising them on direct appeal or on appeal from the denial of his Mo. Sup. Ct. Rule 29.15 motion ("collateral appeal"). Rather, petitioner only raised grounds 1 and 2 of this habeas petition on direct appeal and grounds 3-5 on collateral appeal. (<u>See</u> Respondent's Exhibit B).

-28-

Petitioner did raise what could be construed as ground 6 - that direct appeal counsel was ineffective in failing to argue on appeal that notes should have been handed over by the State of Detective Dillenkoffer's interrogation of Aaron Clary, who testified against petitioner - in a motion to recall the mandate filed in the state courts. (See Respondent's Exhibit S, pg. 9). However, Missouri law provides that a claim of ineffective assistance of counsel not raised in a Mo. Sup. Ct. Rule 29.15 motion is "a complete waiver of any claim that could be raised." Mo. Sup. Ct. Rule. 29.15(b). Petitioner's claim was already waived by the time he filed his motion to recall the mandate, because it was not included in his Rule 29.15 motion. Therefore, under Missouri's independent and adequate state procedural bar, petitioner's attempt to preserve his claim for federal review by filing a motion to recall the mandate does not suffice.

Because grounds 6-12 have been defaulted, they may not be reviewed by this Court unless petitioner can demonstrate cause and actual prejudice, or that failure to consider his claims will result in a fundamental miscarriage of justice. Coleman, 501 U.S. 722, 750 (1991). This Court will not reach the "prejudice" component of the analysis unless it first finds that the petitioner has demonstrated "cause" for his procedural default.

**1. Petitioner Has Not Shown Cause for His Default of Grounds 6-9**

Petitioner does not claim ineffective assistance of post-conviction counsel during collateral proceedings as cause for his failure to raise grounds 6-9, which concern ineffective assistance of counsel on direct appeal. (Doc. No. 16, Petitioner's Reply, pg. 65). Rather, he claims that he raised these grounds in his pro se Rule 29.15 motion, which entitled him to have them reviewed by the motion court. However, counsel did not raise grounds 6-9 in the amended Rule 29.15 motion that she filed. Under Mo. Sup. Ct. Rule 29.15, "[t]he amended motion *shall not incorporate* by reference

-29-

material contained in any previously filed motion." Mo. Sup. Ct. Rule 29.15(g). Therefore, the motion court was not required to issue findings of fact and conclusions of law on petitioner's previously-raised and unincorporated pro se claims.

### 2. Petitioner Has Not Shown Cause for His Default of Grounds 10-12

Grounds 10-12 of the petition concern the State's alleged withholding of evidence. In ground 10, petitioner contends the State withheld knowledge that its second rebuttal witness, Randall Sanford, had been offered a plea deal by the State. In ground 11, petitioner contends that the State withheld its knowledge that Rebecca Caruthers, James Boyd's mother, was providing Boyd with an alibi defense in Boyd's separate trial. In ground 12, petitioner contends that the State withheld knowledge that Boyd was arguing in his trial that he suffered from Asperger's Syndrome, and therefore that he could not have committed the offense.[3]

Concerning ground 10, petitioner claims that the State had already made a plea offer to Sanford by the time he testified against petitioner at trial. Therefore, the State allegedly elicited false testimony from Sanford when Sanford responded on direct examination that no plea offer had been made. Petitioner claims that the attorneys for the State would have been the only people with knowledge of the plea offer, and hence he could not raise this claim at trial. Petitioner's lack of knowledge for this ground for relief allegedly constitutes cause to excuse his procedural default. See Amadeo v. Zant, 486 U.S. 214, 212-22 (1988) ("the failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the [cause] requirement is met.") (quotations and internal citation omitted).

---

[3]Or, presumably, Boyd could have claimed that he had a diminished capacity, rendering him incapable of deliberation, as required for first degree murder.

However, it is not at all clear that a plea offer had been made at the time Sanford testified against petitioner. Sanford pled guilty to DWI in November of 2002, while petitioner's trial took place in October of 2002. Petitioner has no evidence to show that a plea offer had been made to Sanford prior to or during petitioner's trial.

Further, even if petitioner is correct that there was a plea offer that was known uniquely by the State, there is a distinct lack of prejudice to excuse petitioner's default. The trial record reflects that defense counsel sharply cross-examined Sanford on the possibility of his getting a plea deal for testifying against petitioner:

> Q. [Defense counsel]: I see. You know that if you help the prosecutor – strike that. You're offering this information because you're a good citizen, is that it?
>
> A. [Sanford]: No. The reason that I offered this information is because [petitioner] has told me what had happened, and I have kids that's that age.
>
> Q. [Defense counsel]: You're not hoping to get any good out of this, right?
>
> A. [Sanford]: I've never discussed getting anything good out of this.
>
> Q. [Defense counsel]: But you've been around the system long enough to know that if you help them on one hand, they're going to help you on the other?
>
> A. [Sanford]: It's a possibility.
>
> Q. [Defense counsel]: And that's in the back of your mind of course, right?
>
> A. [Sanford]: Well, sure it is.
>
> Q. [Defense counsel]: That would be your hope that if you help them, they'll help you?
>
> A. [Sanford]: Right.

-31-

(Respondent's Exhibit F, 891-92). Since defense counsel for petitioner elicited from Sanford himself his possible motive for testifying against petitioner, it is not likely that a jury would have drawn a much stronger negative impression of Sanford's credibility had an actual plea offer been disclosed. Therefore, petitioner has not shown cause or prejudice to excuse the default of ground 10.

In grounds 11 and 12, petitioner contends that the State failed to disclose two facts known to it from the trial of James Boyd: that James Boyd's mother was providing him with an alibi defense, and that James Boyd was claiming innocence or reduced mental capacity as a result of suffering from Asperberger's Syndrome. There are multiple reasons why petitioner has failed to show cause for failing to raise these grounds in the state courts. First, petitioner's post-conviction counsel should have been aware of these grounds when she briefed and filed petitioner's Mo. Sup. Ct. Rule 29.15 motion in 2006, because they were discussed in a Missouri Court of Appeals opinion from 2004. See State v. Boyd, 143 S.W.3d 36 (Mo. App. W.D. 2004). Therefore, petitioner's claims could have been raised in his amended Rule 29.15 motion. There was no outside impediment that prevented her from doing so.

Second, appellate or trial counsel for petitioner could have spoken to defense counsel for James Boyd or James Boyd's mother herself and found out that Boyd was pursuing these defenses. The State did not prevent counsel from doing so. Nor did it have an obligation to inform petitioner of a defense that does not seem to apply to his case.[4]

**B. *Grounds 13-14 Do Not Satisfy the Actual Innocence Gateway to Cure Petitioner's Procedural Default***

Petitioner fails to show cause for his procedural default. Even though petitioner has failed

---

[4]Unlike James Boyd, petitioner nowhere claims that he suffers from Asperberger's Syndrome.

to demonstrate cause (and, therefore, we do not consider prejudice) for his procedural default, the Court can still reach the merits of his claims if he can show that he is "probably actually innocent" of the crimes for which he was convicted. <u>Bowman v. Gammon</u>, 85 F.3d 1339, 1346 (8th Cir. 1996), <u>cert. denied</u>, 520 U.S. 1128 (1997). To demonstrate his innocence, petitioner must satisfy a two-part test: First, he must support his allegations of constitutional error "with <u>new</u> reliable evidence . . . that was not presented at trial." <u>Id.</u> "[E]vidence is new only if it was not available at trial and could not have been discovered earlier through the exercise of due diligence." <u>Amrine v. Bowersox</u>, 238 F.3d 1023, 1029 (8th Cir. 2001). Second, he must establish "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." <u>Bowman</u>, 85 F.3d at 1346, (citing <u>Schlup v. Delo</u>, 513 U.S. 298 (1995)).

In grounds 13 and 14, and to some extent in grounds 10-12 as previously discussed, petitioner claims he is actually innocent. As new evidence of his innocence, he points to evidence allegedly suppressed by the State in grounds 10-12. He also claims in ground 14 that after his trial, James Boyd's case was reversed and remanded, after which Boyd pled guilty to second degree murder. Petitioner claims that since he was only responsible for murder by way of conspiring with Boyd, then he cannot be guilty of first degree murder when Boyd was convicted of second degree murder.

First, petitioner has not come forward with new evidence that could not have been obtained through the exercise of due diligence by counsel prior to trial. Counsel could have discovered that the victim's mother, Ms. Carruthers, was providing an alibi defense for James Boyd by either (1) talking to Ms. Carruthers directly, or (2) having someone attend Boyd's trial while petitioner's was ongoing. Similarly, petitioner could have discovered Boyd's alleged mental disability - Asperger's

Syndrome - either by observing Boyd's trial or by examining the record on appeal after Boyd's case was reversed. As for Sanford's guilty plea, petitioner has not proven that Sanford was offered a guilty plea prior to testifying against petitioner. Finally, petitioner's claims regarding the destruction of interrogation notes by Detective Eric Dillenkhoffer were already litigated at trial, and this claim does not display any newly discovered evidence.

Second, even if petitioner has presented at least some "new" evidence that could not have been discovered prior to trial, such as Sanford's guilty plea in November 2002, petitioner's evidence does not satisfy the second prong of the Schlup gateway. Knowledge of the Sanford plea would have done little to change the jury's determination, as defense counsel already thoroughly cross-examined and impeached Sanford on the possibility of his receiving a plea deal from the State for testifying against petitioner. Petitioner's alleged alibi defense most likely would have failed, as the State's witnesses would have directly contradicted it. Further, as noted by the Missouri Court of Appeals, "[t]he evidence at the crime scene, the testimony of Lindsay Harper and Aaron Clary, and the confession of [petitioner] overwhelmingly established his guilt beyond a reasonable doubt." (Respondent's Exhibit K, pg. 6). Petitioner has not satisfied his burden to show that "*no reasonable juror would have convicted him* in light of the new evidence." Schlup, 513 U.S. at 327 (1995) (emphasis added). The "overwhelming" proof of petitioner's guilt, and indeed his leadership role in promoting the killing of young Weber, is not diminished by questions about Boyd's involvement and the depth of his culpability.

Lastly, petitioner discusses James Boyd's plea of guilty to second degree murder in a separate case. However, Boyd's plea has no impact on petitioner's case. As respondent correctly notes, the fact that Boyd pled guilty to second degree murder does not mean Boyd "was factually

or actually innocent of murder in the first degree." (Response, Doc. No. 8, pg. 73). The plea was simply a bargain that removed the necessity of a trial. Further, even if Boyd did not deliberate, and therefore was incapable of committing first degree murder, petitioner, as a separate individual, could well have deliberated before Boyd committed the murder and the proof does strongly inculpate petitioner.

Petitioner argues that the jury instructions in his case assumed that Mr. Boyd did in fact deliberate. However, these instructions were based on the parties' knowledge at the time of trial. Further, as respondent notes, whether the instructions were correct as a matter of law has no impact on whether petitioner is factually innocent. Rather, petitioner's jury instruction claim deals with his legal innocence, which does not suffice to satisfy the Schlup gateway for procedurally defaulted claims. See Pitts v. Norris, 85 F.3d 348, 350-51 (8th Cir. 1996).

## SUMMARY OF PROCEDURALLY DEFAULTED GROUNDS

Petitioner has failed to show cause for or prejudice from his default of Grounds 6-12. He does not show that a manifest injustice will occur if these grounds are not reviewed on the merits, and grounds 13 and 14 fail to meet the Schlup standard for actual innocence. Therefore, federal review of grounds 6-14 is barred.

Grounds 6-14 are denied, and the case will be dismissed, with prejudice.

## CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c), the Court may issue a certificate of appealability only "where a petitioner has made a substantial showing of the denial of a constitutional right." To satisfy this standard, a petitioner must show that a "reasonable jurist" would find the district court ruling on the constitutional claim(s) "debatable or wrong."  Tennard v. Dretke, 542 U.S. 274, 276 (2004).

Because petitioner has not met this standard, a certificate of appealability will be denied. <u>See</u> 28

U.S.C. § 2254, Rule 11(a).[5]

## **ORDER**

Accordingly, it is **ORDERED** that:

(1) the above-captioned petition for writ of habeas corpus is denied;

(2) this case is dismissed with prejudice; and

(3) the issuance of a certificate of appealability is denied.

         /s/ Howard F. Sachs               
         HOWARD F. SACHS
         UNITED STATES DISTRICT JUDGE

Kansas City, Missouri,

Dated: April 19, 2012

---

[5]Because of the seriousness of punishment, and some rather unique aspects of the circumstances here, I consider it possible that screening in the Court of Appeals will identify appeal-worthy points that I have not been able to ascertain. On the other hand, petitioner's clearly established guilt, and the switch in tactics from implicating Boyd at trial to welcoming such success as he has achieved, may not help win a certificate from that court.

-36-